## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

GREGORY KARLO-SAMUEL KELLY,

       Plaintiff,

                                    Case No. 13-10634

       v.                             HON. TERRENCE G. BERG

CITY OF OAK PARK, et al.,

       Defendants.

_____/

## OPINION AND ORDER GRANTING IN PART AND
## DENYING IN PART DEFENDANTS' MOTION
## FOR SUMMARY JUDGMENT;
## DENYING PLAINTIFF'S MOTIONS IN LIMINE; AND
## GRANTING PLAINTIFF'S MOTION TO COMPEL

Plaintiff Gregory Karlo-Samuel Kelly brings this action pursuant to 42 U.S.C. § 1983 against the City of Oak Park, Michigan, Detective Robert Koch, Sergeant Jason Ginopolis, and Public Safety Officers Michael Edwards, Matthew Miracle, Jon Lences, and Chris Furlong, for allegedly violating his civil rights by using excessive force during a traffic stop that occurred early on the morning of January 31, 2012.

On January 23, 2014, Defendants filed a joint motion for summary judgment. That motion was fully briefed and the Court heard oral argument on June 4, 2014. Plaintiff has also filed two motions in limine to preclude the introduction of specific categories of evidence at trial, and a motion to compel the production of certain evidence. Defendants have yet to file responses to any of Plaintiff's motions.

As discussed in greater detail below, Detective Koch is entitled to qualified immunity on Plaintiff's claim of excessive force, as he was not present during the arrest. Similarly, the City of Oak Park is entitled to summary judgment on the failure to train theory of Plaintiff's municipal liability claim.

As to the rest of Plaintiff's claims, however, Defendants are not entitled to qualified immunity, and genuine issues of material fact exist such that those claims must be allowed to proceed. Accordingly, Defendants' Motion for Summary Judgment (Dkt. 27) will be GRANTED IN PART and DENIED IN PART. Further, Plaintiff's Motions in Limine (Dkts. 29 & 30) are DENIED WITHOUT PREJUDICE, and Plaintiff's Motion to Compel (Dkt. 39) is GRANTED.

## I.     UNDISPUTED FACTS

Shortly after midnight, on the morning of January 31, 2012, Plaintiff Gregory Karlo-Samuel Kelly was driving eastbound on Eight Mile Road, a wide avenue marking the border between the city of Detroit and its northern suburbs, including the City of Oak Park, Michigan. (Dkt. 32, Ex. 9, Jan. 31, 2012 Audio-Video Feed from Dash-Camera.)[1] Having observed Plaintiff traveling at a rate of speed believed to be in excess of the posted speed limit, Defendant Officers Edwards and Miracle began to effect a traffic stop by flashing their lights while in close proximity to Plaintiff's vehicle; at that moment, Plaintiff was in the left-most lane of the eastbound half of the divided roadway. *Id.* After initially slowing down in that left-

---

[1] The officers' patrol car was equipped with a "dash cam" which produced an audio-video recording of the events of the traffic stop. These events are summarized on the basis of the Court's review of that recording, as well as other contemporaneous recordings from other public safety vehicles that arrived on the scene.

most lane, Plaintiff maneuvered his vehicle across both of the lanes to the right and brought his vehicle to a stop in the far right lane. *Id*. The Officers then pulled over to a stop behind Plaintiff. *Id*. Just before he got out of his patrol car, one of the Officers can be overheard telling the dispatcher, somewhat irritatedly, to "stop fucking cutting me off." *Id* at 00:12:04-00:12:06.

Defendants Edwards and Miracle then got out of their car and began to approach Plaintiff's vehicle—Edwards on the driver's side and Miracle on the passenger side. Upon reaching the vehicle, Officer Edwards instructed Plaintiff, "Shut the car off," to which Plaintiff responded, "I'm late [inaudible] I've got a CCW, just give me my ticket so I can get back on my way to work." *Id* at 00:12:30-00:12:43. Officer Edwards then again repeated his instruction, "Turn the car off." *Id*. at 00:12:43-00:12:45. It appears that Plaintiff complied with this directive, after which Officer Edwards told Plaintiff, "Hand me the keys, please." *Id*. at 00:12:45-00:12:54. This instruction was repeated 4 seconds later. *Id*. at 00:12:54-00:12:59. Plaintiff then asked, "for what?" and Officer Edwards replied, "'cause I said." *Id*. at 00:13:00-00:13:02. Officer Edwards then asked, "where's your gun?" and Plaintiff responded "it's right here," prompting Edwards to ask "where, on the seat?" at which point Officer Miracle stated, "I got it," as he seized the firearm and removed it from the vehicle. *Id*. at 00:13:03-00:13:07. At that point, Officer Edwards opened Plaintiff's door and said, "Step out sir, step out," to which Plaintiff responded "don't open my door dawg;" Officer Edwards then said "face away from me when you step out." *Id*. at 00:13:08-00:13:13. Roughly one second after his last directive, Officer

3

Edwards then reached into the vehicle and appeared to grab Plaintiff's left arm and physically remove Plaintiff from his vehicle, to which Plaintiff remarked, "come on dawg, do not pull me out, I can get out my own damn car nigga I'm a grown fucking man." *Id.* at 00:13:14-00:13:21. Officer Lences then joined Officer Edwards, approaching Plaintiff from his other side, and the two Officers physically guided Plaintiff a few steps away from his vehicle before turning him around and pressing him chest-first back against the rear door of the vehicle on the driver's side, with one Officer saying "get out of your pockets," and Plaintiff responding "I'm not in my pockets," and "stop lying." *Id.* at 00:13:28-00:13:29. While neither of Plaintiff's hands are visible during the very beginning of this exchange, Officer Edwards had removed Plaintiff from his vehicle only a few seconds prior by grabbing his left arm and wrist, and Plaintiff's right hand appears to be visible (above the top edge of the vehicle, with Plaintiff's right arm wedged between his body and the driver's side rear-window) as of 00:13:30. Meanwhile, Officer Miracle returned to the vehicle and grabbed Plaintiff from the right side, 00:13:33-00:13:42, reached between Plaintiff and the vehicle, and brought Plaintiff's right hand behind Plaintiff's back by 00:13:42; throughout this, Plaintiff continued to say "stop lying." At this point, all three Officers physically took Plaintiff down to the ground, somewhat chaotically. Officer Furlong then joined the other officers in something of a "dog pile" on top of Plaintiff, successfully pinning Plaintiff to the ground. *Id.* at 00:13:43-00:13:50.

4

As the Officers began to pull Plaintiff to the ground, Sergeant Ginopolis arrived on the scene (00:13:40), and can be seen drawing his taser as he was exiting his vehicle (00:13:41-00:13:44).  Sergeant Ginopolis then spent several seconds standing next to the dog pile (00:13:44-00:13:54), before kneeling down and stating, "taser, taser, taser" just as he began activating the taser in "drive-stun" mode on Plaintiff (00:13:54-00:14:06).  Throughout the pile-on and initial tasing, various Officers can be heard stating "stop resisting" and "gimme your hands" to which Plaintiff can be heard responding, "I can't breathe." *Id*. at 00:13:51-00:14:08.  One Officer then asked Plaintiff, "want it again, you want it again?" (00:14:09) as various Officers continued to yell "stop resisting" and "gimme your hands" and Plaintiff can be heard responding "I'm trying."  *Id*. at 00:14:09-00:14:20.

Plaintiff can then be heard asking, "all this for what dawg, all this for what," and one of the Officers responded, "you tell me what was this for; this wasn't necessary." *Id*. at 00:14:21-00:14:25.  Plaintiff then said again, "All this for what, speeding? Okay you can tell that to my lawyer," to which an Officer replied "fuck your lawyer." *Id*. at 00:14:26-00:14:32.  By this point, the situation had deescalated, the officers placed Plaintiff in handcuffs and moved away from his person as he remained lying on the road; Plaintiff was clearly upset by what had happened though, and he continued to express his anger and emotion to the officers, prompting one of the Officers to tell him to "shut the fuck up." *Id.* at 00:14:33-00:14:55.  The time elapsed from when Officer Edwards told Plaintiff to step out of

the car until Plaintiff was handcuffed on the pavement was less than two minutes. *Id.* at 00:13:08-00:14:55.

Once Plaintiff was secured in the back of a patrol vehicle, the Officers stood around discussing what had just occurred, with one saying "congratulations," another asking "what happened?" and yet another Officer saying "I had him by the throat, I wasn't about to tase him; I took him to the ground. " *Id.* at 00:16:58-00:17:08.  Sergeant Ginopolis then remarked, "he was on the ground when I threw him a little stun in the leg and then in the side" *Id.* at 00:17:10-00:17:14.

Officer Edwards then recounted his version of the incident to the other Officers, and suggested at two separate points that when Plaintiff initially slowed down in the left-most lane, he was "dumping shit out."[2]  *Id.* at 00:17:15-00:19:12.

## II.    ANALYSIS

 Defendant Officers have moved for summary judgment, arguing first that no constitutional violation occurred, and second, that even if the Officers did violate Plaintiff's rights, they should be entitled to qualified immunity because those rights were not clearly established; the City of Oak Park has also moved for summary judgment on Plaintiff's municipal liability claim (Dkt. 27).

"Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue as to any material fact such that the movant is entitled to a judgment as a matter of law." *Villegas v. Metro. Gov't of Nashville*, 709 F.3d 563,

---

[2] Despite these statements, no controlled substances, contraband, or other evidence was recovered from the vehicle, the Plaintiff's person, or the roadway leading up to the location of the traffic stop.

568 (6th Cir. 2013); *see also* Fed. R. Civ. P. 56(a). A fact is material only if it might affect the outcome of the case under the governing law. *See Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 249 (1986). On a motion for summary judgment, the Court must view the evidence, and any reasonable inferences drawn from the evidence, in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986) (citations omitted); *Redding v. St. Edward*, 241 F.3d 530, 531 (6th Cir. 2001).

"As the moving parties, the defendants have the initial burden to show that there is an absence of evidence to support [plaintiff's] case." *Selhv v. Caruso*, 734 F.3d 554 (6th Cir. 2013); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Once the moving party has met its burden, the non-moving party "'may not rest upon its mere allegations or denials of the adverse party's pleadings, but rather must set forth specific facts showing that there is a genuine issue for trial.'" *Ellington v. City of E. Cleveland*, 689 F.3d 549, 552 (6th Cir. 2012) (citing *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir.2009)).

Here, even with the benefit of the above-referenced video evidence, the Court finds that questions of material fact remain regarding the conduct of the Officers, such that summary judgment would not be appropriate on Plaintiff's false arrest/seizure and excessive force claims against Defendant Officers. As to Plaintiff's excessive force claim against Detective Koch (if Plaintiff's complaint can be construed as making such a claim), and Plaintiff's failure to train theory of

municipal liability against the City of Oak Park, those Defendants are entitled to summary judgment on those claims.

## A.   Qualified Immunity

"Under the doctrine of qualified immunity, 'government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Phillips v. Roane County*, 534 F.3d 531, 538 (6th Cir. 2008) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)).  Determining whether government officials are entitled to qualified immunity generally requires two inquiries:  "First, viewing the facts in the light most favorable to the plaintiff, has the plaintiff shown that a constitutional violation has occurred?  Second, was the right clearly established at the time of the violation?" *Id.* at 538–39.  Further, these two these prongs need not be considered sequentially.  *Jones v. Byrnes*, 585 F.3d 971, 975 (6th Cir. 2009) (citing *Pearson v. Callahan*, 555 U.S. 223, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009)).

### 1.   *False Arrest/Seizure of Plaintiff*

The first claim the Court must consider is whether Plaintiff's rights were violated by the very fact of his arrest.  It is clearly established that the Fourth Amendment requires probable cause for an arrest.  *See Crockett v. Cumberland College,* 316 F.3d 571, 580 (6th Cir. 2003).  The probable cause determination turns on whether "facts and circumstances within the officer's knowledge [ ] are sufficient

8

to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Michigan v. DeFillippo,* 443 U.S. 31, 37 (1979). Additionally, the circumstances are viewed from the perspective "of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Klein v. Long,* 275 F.3d 544, 550 (6th Cir. 2001) (citations omitted). "In general, the existence of probable cause in a § 1983 action presents a jury question, unless there is only one reasonable determination possible." *Id.* 550 (quoting *Gardenhire v. Schubert,* 205 F.3d 303, 315 (6th Cir.2000)); *see also Crockett*, 316 F.3d at 581.

Here, Plaintiff was arrested and charged with "resisting and obstructing." Defendants' primary argument with respect to the arrest is that Plaintiff's somewhat dilatory compliance with Officer Edwards's directives to "Turn the car off," or "Hand me the keys, please" or "Step out sir, step out," constituted a failure to comply with a lawful command, amounting to probable cause to make an arrest for resisting and obstructing. While all three of Officer Edwards's directives were reasonable, it is not clear from all the surrounding circumstances[3] that the decision to lays hands on Plaintiff, physically extract him from the car, incapacitate him, and take him into custody by hand-cuffing him was reasonably justified by Plaintiff's slow response to those directives.

---

[3] The circumstances here involved a routine traffic stop for speeding, where the motorist appropriately declared he had a CCW permit and alerted the officers to the presence of a firearm, the firearm was immediately secured by another officer, and the driver appeared to be complying with officer commands slowly and reluctantly after stating that he was in a hurry and needed to get to work. At the time the Plaintiff was forcibly removed from his car, taken to the ground, and tased several times, there had been no observable indicia of dangerousness, no evidence of other criminal activity, and no attempt to flee or "resist" prior to the moment of being seized.

9

Defendants maintain that the traffic stop was initiated on the basis of Plaintiff's alleged speeding. When Officer Edwards first approached the vehicle, Plaintiff announced that he had a CCW, as required by MCL 28.425f(3), and Officer Miracle then proceeded to reach into the vehicle and seize the firearm. At no point in the encounter did any Officer ask Plaintiff the standard questions the average driver expects to be asked when stopped for speeding: to see his driver's license, registration, or proof of insurance. These questions were not asked. Moreover, even though Plaintiff volunteered that he had a CCW, no officer asked to see Plaintiff's license to carry a concealed weapon. While the paramount concern of officer safety clearly justified Officer Miracle's temporary seizure of the firearm, Plaintiff's possession of the firearm was presumptively lawful, and its mere presence under these circumstances did not justify the forceful arrest of Plaintiff.

Rather than asking Plaintiff for his license and vehicle registration, or to see his CCW permit, Officer Edwards ordered Plaintiff to step out of his vehicle and face away from him as he did so—a request that understandably might need a few seconds to be processed and acted upon by a driver who had been expecting a speeding ticket. Officer Edwards then reached into the vehicle and began to pull Plaintiff from his seat. This entire phase of the parties' interaction, from the initial directive to "step out sir, step out" to when Officer Edwards first laid hands on Plaintiff, lasted approximately six seconds. Nothing in the evidence shows that Plaintiff presented a threat to the Officers, and Plaintiff had not been told that he was under arrest before force was applied. After pulling Plaintiff out of the car,

Officers Edwards and Lences pressed him up against his vehicle, repeatedly ordering him to keep his hands out of his pockets, while Plaintiff was saying "I'm not in my pockets" and "stop lying," apparently responding to the Officers' order by saying that he did not have his hands in his pockets. As discussed previously, the situation only escalated from there. Taking the facts in the light most favorable to Plaintiff, there is nothing about Plaintiff's less than immediate compliance that required such a forceful and ultimately violent police response.

While it is true that qualified immunity "'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law,'" *Hunter v. Bryant*, 502 U.S. 224, 229 (1991) (quoting *Malley v. Briggs*, 475 U.S. 335, 343 (1986)), and applies irrespective of whether the official's error was a mistake of law or a mistake of fact, or a mistake based on mixed questions of law and fact, *see Pearson v. Callahan*, 555 U.S. 223, 231 (2009), it is equally true that all persons have the right under the Constitution to be "secure … against unreasonable searches and seizures." Amend. IV, Const.

A citizen's right not to be subjected to unreasonable searches and seizures is indeed well established and known to every police officer in the United States. Considering the record available here, the Court cannot conclude that the decision to make an arrest based on the available evidence of criminal activity was reasonable. In this case, the circumstances[4] suggest that Plaintiff's compliance with the state's concealed weapon notification law may have played a role in

---

[4] The Court has carefully reviewed the video of the night in question, but there are moments where statements made by both Plaintiff and the Defendant Officers remain inaudible.

11

causing him to be subjected to a forceful arrest, an arrest that was allegedly for resisting and obstructing arrest. From viewing the video recording of the incident, it does not appear that any "resistance" occurred until after the Plaintiff was physically hauled out of the car and pushed against it. It is not clear what basis a reasonable officer would have had to arrest the plaintiff for resisting arrest *before* force was applied and the scuffle began. Consequently, the Court cannot extend qualified immunity to shield the Officers' conduct. Accordingly, Defendant's motion is DENIED with respect to Plaintiff's unlawful arrest and seizure claim.

   2. ***Excessive Force Against Officers Edwards, Lences, Miracle, and Furlong***

   Plaintiff also alleges in Count II of the Amended Complaint that he was subjected to excessive force. Under the Fourth Amendment, individuals have a right to be free of excessive force when police make an arrest or seizure. *Graham v. Conner,* 490 U.S. 386, 394-95 (1989). This inquiry turns on the objective reasonableness of the officer's conduct in view of the facts and circumstances facing the officer. *Id.* at 397. As the Court has already concluded that the question of probable cause vis-à-vis Plaintiff's resistance to a lawful command must be submitted to the jury, Officers Edwards, Lences, Miracle, and Furlong (i.e. those Officers involved in the initial seizure and takedown of Plaintiff) cannot be granted qualified immunity at this time.

12

If the arrest was unlawful, then it would follow that *any* use of force was objectively unreasonable and excessive under those circumstances. If the arrest[5] was lawful, the Court cannot conclude that the degree of force used to restrain and detain Plaintiff was objectively unreasonable. Consequently, if the arrest were shown to have been reasonable, and supported by probable cause, the Officers would be entitled to qualified immunity on the claim of excessive force. Thus, the question of these Officers' immunity is dependent upon the jury's determination of the lawfulness of the arrest. For now, Defendants' motion for summary judgment must be DENIED on the claim of excessive force with respect to these four Officers.

### 3.   *Excessive Force Against Sergeant Ginopolis [Taser]*

As to Sergeant Ginopolis, who deployed his taser in "drive-stun" mode after Plaintiff had already been taken to the ground by four other officers, the Court will consider whether such conduct was objectively unreasonable, even assuming that the arrest was justified by probable cause. There is no question that this conduct would be clearly excessive if Plaintiff's arrest is determined to be unlawful.

In making this evaluation, courts look at: "[1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. Here, the low severity of the "resisting and obstructing" offense, the lack of a safety threat posed by an individual who is

---

[5] By "arrest," the Court refers to arrest for resisting and obstructing. If the question presented were whether the Officers should be entitled to qualified immunity for the excessive force claim where the "arrest" was for speeding only, the Court does not find that the degree of force used was reasonable under the circumstances for such an arrest, and qualified immunity would not be available.

13

already underneath four other Officers, and the open question as to whether
Plaintiff was resisting arrest leave the Court unconvinced as to the reasonableness
of the taser deployment.  It is also worth noting that Sergeant Ginopolis watched
the situation unfold for several seconds while holding his taser, and that during
that period of time, Plaintiff was taken to the ground by four officers; only then,
once Plaintiff was pinned to the ground, did Sergeant Ginopolis deploy his taser.
*See Hagans v. Franklin Cnty. Sheriff's Office*, 695 F.3d 505 (6th Cir. 2012) (noting
force becomes excessive when suspect is compliant or has stopped resisting, and
citing *Landis v. Baker,* 297 F. App'x 453 (6th Cir. 2008) (officers used excessive force
by repeatedly tasing a suspect who was pinned on the ground with his face
submerged in muddy water) and *Roberts v. Manigold,* 240 F. App'x 675, 676 (6th
Cir. 2007) (officers used excessive force by repeatedly tasing suspect even though he
was "completely pinned")).

Thus, even if the jury determines that Plaintiff's arrest was lawful, they must
then consider whether Plaintiff had stopped resisting arrest (or whether he had
even been resisting in the first place) at the time of the taser deployment;
accordingly, Defendants' motion must also be DENIED with respect to Sergeant
Ginopolis.

### 4.  *Excessive Force Against Detective Koch*

As to Detective Koch, it does not appear that Plaintiff is advancing an
excessive force claim.  Regardless, there are no allegations that Detective Koch was
involved in, or supervised the arrest and use of force.  There is no genuine issue of

14

material fact that Detective Koch was completely uninvolved in the traffic stop. Therefore, Detective Koch is entitled to qualified immunity and summary judgment on any possible excessive force claim. *See Smoak v. Hall*, 460 F.3d 768, 784 (6th Cir. 2006).

### 5.  Seizure and Impounding of Vehicle

In Count IV of the Amended Complaint, Plaintiff alleges that the seizure and impoundment of his vehicle violated his Fourth and Fourteenth Amendment rights because the vehicle was seized without probable cause.

Defendants argue at length that the "decision to impound was reasonable under the circumstances." *Collins v. Nagle*, 892 F.2d 489, 494 (6th Cir. 1989).  In making this argument, Defendants cite numerous cases from a variety of circuits, all suggesting that the impounding of a vehicle is reasonable when there is no driver available to remove it from the scene of the arrest.  However, Defendants fail to address Plaintiff's main argument, namely that the only reason there was no one available to drive the vehicle away from the scene is because – as alleged by Plaintiff – Defendants had unlawfully arrested Plaintiff.  Hence there is no evidence to suggest that summary judgment would be appropriate on this claim.

### 6.  Equal Protection & Plaintiff's Motion to Compel

Count III of Plaintiff's First Amended Complaint alleges that the Defendant Officers acted in concert to deny him the equal protection of the law because of his race.  As noted by Defendants, the Sixth Circuit has adopted a three-part test for determining if selective enforcement has occurred.  Plaintiff must show:  (1) the

15

Defendant Officers singled Plaintiff out as belonging to an identifiable group (African-American race) for a traffic stop or use of force even though the same government official decided not to stop or use force against other similarly situated persons who do not belong to Plaintiff's race; (2) the Defendant Officers initiated the stop and use of force against Plaintiff with a discriminatory purpose in mind; and (3) the stop and use of force had a discriminatory effect upon the racial group to which Plaintiff belonged. *Gardenhire v. Schubert*, 205 F.3d 303, 319 (6th Cir. 2000); *United States v. Anderson*, 923 F.2d 450, 453 (6th Cir. 1991). Discriminatory purpose may be shown by demonstrating that the Defendant Officers selected or reaffirmed a particular course of action against Plaintiff at least in part because of, not merely in spite of, its adverse effects upon African Americans as a race. *Wayte v. United States*, 470 U.S. 598, 610; 105 S.Ct. 1524; 84 L.Ed.2d 547 (1985).

Plaintiff's primary argument in support of his equal protection claim is based upon a sampling of use of force/taser reports, obtained from the Oak Park Department of Public Safety via FOIA request, which showed that out of 18 taser deployments over a two-year period, 16 of them were against African Americans, 1 was against a Latino, and one was against a dog. *See* Dkt. 32, Ex. 10, p. 19-20; Dkt. 27, Ex. H, 54:4-14. Defendants argue that this is insufficient to show any sort of selective enforcement, as Plaintiff does not have evidence sufficient to show the racial breakdown of traffic stops or other encounters incident to arrest, or the percentage of arrests against individuals of various races that involved some type of use of force.

16

While Defendants' argument as to a lack of evidence would typically be quite persuasive, Plaintiff has filed a motion to compel the production of just this type of evidence (Dkt. 39), arguing that he had been lead to believe the evidence did not exist.  During oral argument on the motion for summary judgment, however, Defendants' counsel suggested that such evidence is, in fact, maintained by the City of Oak Park Department of Public Safety.

In light of the data concerning the use of tasers, any additional statistical information that may be maintained by Defendants would be highly probative and likely to clarify whether or not Plaintiff has a viable equal protection claim.  If such information is in fact maintained, it should be provided.

Accordingly, Plaintiff's Motion to Compel shall be GRANTED, and Defendants will be required to produce to Plaintiff, within 30 days, any and all statistical evidence in their possession, including without limitation such information as the race of suspect, city of residence, reason for stop, degree of force used (if any), and outcome of stop (e.g., arrest/citation/warning) for any traffic stop conducted by the Oak Park Department of Public Safety for the 10 years prior to the incident in question, or for whatever period shorter than 10 years that data may be maintained.

Further, Defendants' request for summary judgment on this claim is DENIED pending the production of such discovery; Defendants may file a renewed motion for summary judgment addressing Plaintiff's equal protection claim within 14 days of tendering this discovery to Plaintiff.

17

**B.      Municipal Liability of the City of Oak Park**

Count VI of the Complaint asserts a municipal liability claim against the City of Oak Park for failure to adequately and properly train, supervise, and discipline its Officers so as to prevent the unconstitutional conduct alleged above.

In order to succeed on such a claim, a plaintiff must establish both (1) that his or her constitutional rights were violated and (2) that a policy or custom of the municipality was the "moving force" behind the deprivation of the plaintiff's rights. *See Powers v. Hamilton County Pub. Defender Comm'n*, 501 F.3d 592, 606-07 (6th Cir. 2007) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978)).

"A plaintiff can make a showing of an illegal policy or custom by demonstrating one of the following: (1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations." *Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013) (citing *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir.2005)).  Here, Plaintiff's argument for municipal liability is based on both an alleged policy of inadequate training, and a policy of condoning the unlawful use of force against minorities.

"That a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program." *City of Canton v Harris,* 489 U.S. 378, 391 (1989).  However, a systematic failure to train police officers

18

adequately is a custom or policy which can lead to municipal liability. *See Gregory v. City of Louisville*, 444 F.3d 725, 753 (6th Cir. 2006) (citing *City of Canton*, 489 U.S. at 388). "The inadequacy of police training only serves as a basis for § 1983 liability where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *Slusher v. Carson*, 540 F.3d 449, 457 (6th Cir. 2008) (internal quotation omitted). To establish deliberate indifference related to training, a plaintiff "must show prior instances of unconstitutional conduct demonstrating that the [municipality] has ignored a history of abuse and was clearly on notice that the training in this particular area was deficient and likely to cause injury." *Fisher v. Harden*, 398 F.3d 837, 849 (6th Cir. 2005); *see also City of Canton v. Harris*, 489 U.S. 378, 388 (1989).

As evidenced by the deposition testimony of the Defendant Officers, there exists no genuine issue of material fact that the City of Oak Park Officers, including the individual defendants, received appropriate supervision, discipline, and training regarding reasonable seizures, the use of force in general, and the use of tasers specifically. (Dkt. 27, Ex. D – Ginopolis Dep., pp. 22-24; Ex. E – Lences Dep., pp. 25-31; Ex. C – Miracle Dep., pp. 29-30; Ex. H – Cooper Dep., pp. 24-27, 78-81.) Likewise, Plaintiff has not shown a pattern of similar excessive force violations, such that an obvious need for training could be attributable to the city. *See City of Canton*, 489 U.S. at 388.

However, Defendants do not appear to dispute that the City of Oak Park lacks a policy as to how to respond to a CCW notification, and neither Officers

19

Edwards, Miracle, Sergeant Ginopolis, nor Chief Cooper were able to provide accurate testimony as to the requirements of Michigan's CCW notification law. *See* Dkt. 32, Ex. 10, pp. 6-7. Nevertheless, Plaintiff has failed to allege *any* past incidents involving an overreaction to a CCW notification. Without any allegation that the Defendants were aware of a problem such as this, the lack of a policy regarding CCW notification and the failure to train on such a policy cannot be said to constitute deliberate indifference to the rights of citizens. "Deliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Stemler v. City of Florence,* 126 F.3d 856, 865 (6th Cir. 1997) (citation omitted).

Accordingly, Plaintiff cannot establish the prerequisite to municipal liability under §1983 under his failure to supervise and train theory. Defendants are entitled to summary judgment on this theory. Plaintiff advances a second theory of municipal liability, however, alleging that Oak Park had a policy of condoning unlawful conduct against minorities. As to this theory, its viability depends greatly on the kind of information contained in the previously compelled discovery pertaining to Plaintiff's equal protection claim. Defendants' request for summary judgment on this theory of municipal liability is therefore DENIED pending the production of the requested discovery. As with Plaintiff's equal protection claim, Defendants may file a renewed motion for summary judgment addressing this aspect of Plaintiff's municipal liability claim within 14 days of tendering discovery to Plaintiff. For the above reasons, Defendant Oak Park's motion for summary

20

judgment as to municipal liability must be GRANTED IN PART and DENIED IN PART.

## C.      Motions in Limine

Plaintiff has also filed two Motions in Limine (Dkts. 29 & 30), seeking to exclude broad categories of otherwise admissible evidence on the basis of Federal Rule of Evidence 403.  As the Sixth Circuit has previously stated, "Orders in limine which exclude broad categories of evidence should rarely be employed. A better practice is to deal with questions of admissibility of evidence as they arise." *Sperberg v. Goodyear Tire & Rubber Co.*, 519 F.2d 708, 712 (6th Cir. 1975).  This Court agrees.

As to both of these motions, it is unclear at this time whether Defendants are seeking to offer evidence of the kind that Plaintiff is seeking to exclude. Accordingly, the need for a determination as to the admissibility of any of this evidence appears premature.  The parties are encouraged to discuss these issues and, if possible, reach an agreement prior to trial.

For now, both of Plaintiff's Motions in Limine are DENIED WITHOUT PREJUDICE.  In the event that this matter proceeds to trial and the parties are unable to reach an agreement as to the admissibility of certain types of evidence, either party may file (or re-file) a motion in limine requesting a pretrial ruling, within the time limits to be set forth in the Court's Amended Scheduling Order.

### III.   CONCLUSION

For the reasons stated above, Defendants' Motion for Summary Judgment (Dkt. 27) is **GRANTED IN PART** and **DENIED IN PART.**  Specifically, Defendants' motion is **GRANTED** as to any excessive force claim against Detective Koch, and as to the "failure to train" theory of municipal liability claim against the City of Oak Park.  As to all of Plaintiff's other claims, Defendants' motion is **DENIED**.

Further, Plaintiff's Motion to Compel (Dkt. 39) is **GRANTED**; Defendants are **ORDERED** to produce to Plaintiff, within 30 days, any and all statistical evidence in their possession, including without limitation all statistical reports pertaining to traffic stops conducted by the Oak Park Department of Public Safety that include such information as the race of suspect, city of residence, reason for stop, degree of force used (if any), and outcome of the stop (e.g., arrest / citation / warning) compiled during the 10 years prior to the incident in question, or for whatever period shorter than 10 years during which such data may have been maintained.

Finally, Plaintiff's Motions in Limine (Dkts. 29 & 30) are **DENIED WITHOUT PREJUDICE**.

SO ORDERED.

Dated:  September 29, 2014                       s/Terrence G. Berg
                                                 TERRENCE G. BERG
                                                 UNITED STATES DISTRICT JUDGE

22

**Certificate of Service**

I hereby certify that this Order was electronically submitted on September 29, 2014, using the CM/ECF system, which will send notification to all parties.

s/A. Chubb
Case Manager